**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

BRAD JOHNS,

  *Plaintiff,*

v.

MICHAEL WHITAKER,

  *Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 4:23-cv-00761-JMD

<u>**MEMORANDUM AND ORDER**</u>

Most pilots are required to obtain and renew a medical certificate from the Federal Aviation Administration certifying that they are physically fit to fly.  Eleven times over the course of a decade, Brad Johns falsely stated on his medical certificate renewal application that he had never received medical disability benefits.  The FAA concluded that his statements were intentionally false and revoked his pilot's license and medical certificates. The Court agrees that the FAA has established by a preponderance of substantial evidence that Johns's statements were intentionally false.  The Court upholds the FAA's decision.

**Regulatory Background**

Because the FAA must "promote safe flight of civil aircraft," pilots generally cannot fly unless the FAA certifies their health and competence.  49 U.S.C. §§ 44701(a), 44702; 14 C.F.R. 61.3(c).  Pilots are required to regularly renew their medical certificates using Form 8500-8, which mandates health disclosures.  14 C.F.R. 61.23(a), (d).  Pilots must be candid when submitting the form.  A "fraudulent or intentionally false statement on any application for a medical certificate" is grounds for "[s]uspending or revoking all airman, ground instructor, and medical certificates and ratings held by that person," among other possible

1

sanctions.   14 C.F.R. § 67.403(a)(1), (b)(1) (1996) (modified into current regulation at 14 C.F.R. § 3.403).

Since 2008, Form 8500-8 has asked pilots to disclose whether they have received medical disability benefits. The FAA altered the form in 2008 to ask this question because some applicants historically failed to report serious medical conditions.   ECF 55 at 7. Question 18(y) on the form asks an applicant to check "yes" or "no" to "whether you have ever in your life been diagnosed with, had, or do you presently have any of the following . . . medical disability benefits." ECF 11-1 at 5.  Checking "yes" does not bar a pilot from flying, but it can trigger additional inquiry.  ECF 55 at 7.  Disability benefits from the Department of Veterans Affairs are paid to retired servicemembers for "disability resulting from personal injury suffered or disease contracted in line of duty," 38 U.S.C. §§ 1110, 1131, and the FAA considers them to be "medical disability benefits," ECF 55 at 7.  Applicants receiving these benefits must check "yes" to Question 18(y).  *Id.* at 8.

### Johns's History of Sleep Apnea

The FAA is particularly interested in learning whether a pilot has obstructive sleep apnea.  After incidents where pilots fell asleep in the cockpit, the National Transportation Safety Board directed the FAA to screen pilots for sleep apnea. ECF 34-1 at 46.  Undiagnosed sleep apnea can cause a fourfold increase in risk of heart attack or stroke and a sevenfold increase in the risk of an accident.  *Id.* at 47.  But sleep apnea does not automatically disqualify a pilot.  *Id.* at 47–48.  To encourage pilots to disclose sleep apnea, pilots still receive a certificate after they disclose.  *Id.*  The FAA then gives them 60 days to provide more information about their obstructive sleep apnea.  *Id.* at 48–49.  A pilot may retain a medical certificate despite sleep apnea if remedial measures (such as using a CPAP machine) are effective.  *Id.* at 50.

2

Federal officials first suspected Johns of having sleep apnea in 2003 after he submitted an insurance reimbursement request for a sleep study he completed in Costa Rica. ECF 11-1 at 60. Johns asserted that the study had cleared him and that he participated in it only because his wife complained about his snoring. *Id.* But he did not give the examining nurse the results of the study, saying instead that he had the results "somewhere." ECF 11-1 at 60. The nurse noted Johns's apparent frustration "that we were not accepting his word" about the results of the Costa Rican study. *Id.* at 61.

When Johns explained to another officer the following week that the whole situation had been "blown out of proportion," the official was concerned that Johns "may be trying to conceal a legitimate medical issue." *Id.* at 64. Officials disqualified Johns from flying until the issue could be "formally resolved." *Id.* at 64. Johns eventually provided a letter from a Costa Rican clinic stating that Johns's sleep study test did not reveal obstructive sleep apnea. *Id.* at 62. He participated in a second sleep study, which also found no sleep apnea. *Id.* at 65. Johns returned to flying. *Id.* at 65, 87.

In 2013, a doctor reported that Johns needed to use a CPAP machine. The doctor examined Johns and filled out a disability benefits questionnaire, checking "yes" in the box that asked, "Does the Veteran require the use of a breathing assistance device such as continuous positive airway pressure (CPAP) machine?" ECF 11-5 at 14. Around the same time, Johns began receiving substantial benefits from the Department because of the doctor's finding of obstructive sleep apnea and use of a CPAP machine. ECF 11-4 at 32; ECF 11-1 at 35. Despite this record, Johns denies using a CPAP machine before 2019. ECF 34-1 at 155.

In 2019, Johns was diagnosed with mild sleep apnea. ECF 11-1 at 112. This put him at risk for excessive daytime sleepiness, hypertension, cardiovascular disease, cardiac arrhythmia, stroke, hyperglycemia/diabetes, and other problems. *Id.* at 113. Because

3

Johns's condition was mild and because he denied symptoms of daytime sleepiness, the doctors did not require him to use a CPAP machine.  *Id.* at 120.

**Johns's Failure to Disclose Medical Disability Benefits on Form 8500-8**

Johns first filed for disability benefits in 2001, within a week of his retirement from the Air Force.  ECF 11-4 at 22.  He sought disability benefits for the following conditions:

- Allergic rhinitis
- Recurrent left shoulder dislocation
- Recurrent right shoulder dislocation
- Strain to a left toe
- Shin splints
- Migraine headaches
- Left ankle sprain, and
- Left varicocele.

*Id* at 22–23.  The Department examined his service medical records and reviewed his 2002 medical examination.  It determined that Johns's first three claims were connected to his service and entitled him to a 10-percent disability rating.  *Id.*  The Department awarded Johns monthly payments of $103 as compensation for these service-incurred disabilities.  ECF 11-1 at 59.  Johns returned to active duty several times over the next eleven years.  *Id.* at 66, 124.  When he was on active duty, the benefits stopped.  ECF 34-1 at 114; *see also* 38 U.S.C. § 1110 (stating that veterans are entitled to benefits when they are "discharged or released" from service).

Johns sought disability benefits at least two more times.  First, in 2012, he sought disability benefits for 14 different conditions, including "obstructive sleep apnea" and "hearing loss."  ECF 11-4 at 30–31.  The Department determined that Johns had nearly a dozen disability conditions connected to his military service.  *Id.* at 31.  Based largely on a finding that he had "obstructive sleep apnea" that required use of a CPAP machine or similar device, the Department determined that he was 80 percent disabled.  *Id.* at 32, 51.  Johns

was again awarded disability benefits, and his monthly payments increased from $103 to $1,844 each month. ECF 11-1 at 33. Although sleep apnea was the biggest reason for the increase, the Department also determined that he had nearly a dozen other disability conditions connected to his military service. ECF 11-4 at 31. The Department, however, rejected Johns's assertion that he was entitled to disability benefits for hearing loss. *Id*. Second, six weeks after receiving the previous award, Johns filed for disability benefits again. *Id*. at 45. He sought benefits for three conditions, two of which the Department determined were service related. *Id*. But the Department determined that these two conditions did not increase his 80-percent rating. *Id*. at 51.

Despite receiving these benefits, Johns repeatedly failed to disclose them. Eleven times between 2008 (when Question 18(y) was added) and 2018, Johns stated incorrectly on his medical certificate renewal form that he had never received medical disability benefits. ECF 11-1 at 5. Only after the FAA opened a fraud investigation in 2018 did Johns admit that he was receiving benefits. ECF 34-1 at 84, 86–87. The next year, he checked "yes" on Question 18(y) for the first time. ECF 11-1 at 98.

After concluding that Johns made intentionally false statements between 2008 and 2018 about not receiving disability benefits, the FAA revoked his license and medical certificates and banned him from reapplying for a license for a year. *Id*. at 4–6. An administrative law judge upheld the revocation after a hearing, and Johns lost his appeal to the National Transportation Safety Board. He then appealed to this Court under the Pilot's Bill of Rights, which permits district courts to review the FAA's decision to revoke a pilot's certification. Pub. L. No. 112-153, § 2(e)(2), 126 Stat. 1159, 1161–62 (2012). Johns also requested a new evidentiary hearing.

The Court ruled that the standard for review is *de novo* and rejected Johns's request for another hearing. Because the "central question" in the case is whether Johns knew his

statements were false, the Court concluded that a hearing would be appropriate "only if" the existing record was insufficient to resolve this central question of knowledge. ECF 42 at 4. The Court directed the parties to file dispositive motions. *Id.* at 5.

## Analysis

The dispositive question is whether Johns's statements on his medical certificate forms were intentionally false. If so, the FAA's decision was justified because making an "intentionally false statement . . . is a basis for" revoking a medical certificate. 14 C.F.R. § 3.403(a), (d).[1] A statement is intentionally false if the statement is (1) knowingly made, (2) false, and (3) material. *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976). Johns conceded the second and third elements before the administrative law judge, contesting only whether he knew his material statements were false. ECF 34-1 at 19. The Court determines *de novo* that the FAA proved by a preponderance of substantial evidence that Johns knew his statements were false.

Johns also moves for a jury trial and—for the first time on appeal—contests whether his false statements were material. But Johns waived both issues, and his materiality argument fails in any event.

## I.

Johns first argues that his interest in his certificates is a private right, which means he is constitutionally entitled to a jury trial in an Article III tribunal. ECF 47 at 6. The Court agrees for the reasons stated in its previous order. *See* ECF 42 at 1–2. But the right to a jury trial is waived if a party fails to properly serve and file a demand. Fed. R. Civ. P. 38(d). Johns did not demand a jury trial in his initial complaint, nor did he serve the opposing

---

[1] Another regulation applied when the FAA acted against Johns. *See* 14 C.F.R. § 67.403(a)(1). The language of the newer regulation is different, but the relevant substance is the same.

party with a written demand "no later than 14 days after the last pleading directed to the issue [was] served." Fed. R. Civ. P. 38(b)(1). Johns argues that the Court should excuse this waiver because the Supreme Court clarified the doctrine of private rights after he filed his complaint, *SEC v. Jarkesy*, 603 U.S. 109 (2024). But although a court may excuse a waiver of jury trial rights, *Spear v. Dayton's*, 771 F.2d 1140, 1144 (8th Cir. 1985), Johns did not move for a trial until almost a year after *Jarkesy*. Even then, he requested only a trial, not a jury trial. Johns did not demand a jury trial until October 2025, after the Court directed the parties to file dispositive motions. The Court thus declines to excuse his waiver of jury trial.

## II.

The Court concludes that Johns knew his statements were false when he asserted that he did not receive medical disability benefits. Johns arguably waived this issue. In response to Johns's request for a hearing, the Court said it would "determine whether dispositive issues can be resolved on the available record" and would allow a new hearing or supplementation of the record only if the record "prove[d] insufficient." ECF 42 at 4, 1. The Court thus expected the parties to argue about (1) whether the record evidence better supports intent or mistake, and (2) whether the record evidence is sufficient for the Court to draw a conclusion. The FAA argued both issues. In contrast, Johns barely addressed the first point and dedicated just one paragraph to the second. He instead spent almost his entire brief arguing for the Court to excuse his waiver of his jury trial right. And he waited until his reply brief to meaningfully discuss these other points.

The Court nonetheless addresses his arguments despite the potential waiver. Johns argues that his statements were based on a misunderstanding in that he did not know his statements were false. ECF 56 at 4. He asserts that "[t]here is no evidence showing that at the time he completed his 8500 Form he believed his [Department] Pension and

7

Compensation Benefits were a 'medical disability' of the nature referenced by the 8500 Form." *Id.* at 5.  But there is evidence.

**1.** Consider the correspondence Johns had with the Department.  Johns applied for disability benefits at least three times, including right after he first left active duty.  When Johns initially filed for benefits, the Department sent him a letter stating in the very first sentence that it had "made a decision on your claim for service connected disability benefits." ECF 11-1 at 58.  The Department granted Johns a "combined service connected disability of 10%." *Id.* at 59.  This language appeared in a chart right next to a statement saying Johns would receive $103 each month for his disability.

Additional correspondence made similar references to Johns's disability claims.  The Department stated in the introductory paragraph of one letter that it was responding to Johns's request for disability benefits.  ECF 11-4 at 30 ("Since your claim was filed in conjunction with [Department]'s Quick Start initiative, the effective date for all disabilities shown to be incurred in service will be November 2, 2012, the day following discharge, unless otherwise specified.").  Another letter acknowledged Johns had "filed a new claim for benefits" and repeatedly mentioned that the benefits were for his disabilities.  *Id.* at 45–48 ("Service connection may be granted for a disability which began in military service or was caused by some event or experience in service.").  The government sent many other documents to Johns explaining that the benefits were disability benefits.  *See*, *e.g.*, ECF 11-4 at 41 (listing sleep apnea as a "static disability"); ECF 11-1 at 84 (noting Johns's "combined evaluation is 30 percent or more disabling"); ECF 11-4 at 48 (denying benefits for a skin issue that had not been medically diagnosed as a disability and again highlighting that "[s]ervice connection may [only] be granted for a disability which began in military service . . . ."); ECF 11-1 at 36–37 (describing conditions entitling Johns to benefits and attaching a "Disability Compensation Award Attachment-Important Information" form).

**2.** Johns self-reported his own disabilities each time he applied for disability benefits and was interviewed by medical examiners in connection with those applications. *See* ECF 11-4 at 53–61 through ECF 11-6 at 21 (covering medical examinations in 2002, 2012, and 2013). Medical examiners understood that Johns was applying for disability benefits. The form they completed emphasized in bold on the first page that Johns "is applying to the U.S. Department of Veterans Affairs (VA) for disability benefits." ECF 11-4 at 80. Johns reported disabilities to doctors during each examination. For example, Johns reported in his 2012 examination that he had been a strong snorer for two decades and that a sleep study test in 2003 showed borderline obstructive sleep apnea. *Id.* at 76. The doctor diagnosed "[b]orderline obstructive sleep apnea, documented." *Id.* at 77. The doctor also listed 16 medical conditions Johns reported as his "Chief Complaints." *Id.* at 70.

**3.** Johns received regular disability payments. Beginning shortly after he left active duty and continuing for years, Johns collected monthly payments. Johns says he did not know those benefits were related to a disability. He contends he believed those benefits were "sort of like a pension." ECF 34-1 at 158. That contention is hard to square with all the documents Johns received explaining that the benefits were because of medical disabilities. And Johns's benefits sharply increased in 2013 after a medical examiner determined that he needed to use a CPAP machine. Johns says he "didn't think twice about" this 1,790-percent increase in his monthly payments. *Id.* at 157. But that argument requires accepting that Johns was completely uninterested in why he suddenly was receiving more than $20,000 a year from the government when he had previously received just over $1,000 a year.

Johns also suggests that he believed the payments might be tied to predictions about *future* disability. For example, he said he thought the benefits were "due to things that happened to me while I [was] active duty." *Id.* at 158. It was as if the military were saying

9

"we are sorry this happened to you when you were on active duty, but this will be here, you know, for the rest of your life." *Id.* at 160; *see also id.* at 157 (saying the payments were "looking at care, going all the way in the future"). This assertion that he believed the benefits were based on predictions of future disability contradicts his assertion that he "didn't think twice" about these benefits.

But in any event, there is other evidence showing that Johns knew he was receiving benefits for current—not future—disabilities. When the Department denied benefits for Johns's hearing loss, for example, it highlighted that there was "no evidence" he "currently" had the condition and that the record lacked sufficient "current audiometric findings." ECF 11-4 at 39. So Johns did not "currently meet" the Department's hearing loss criteria. *Id.* This denial should have alerted Johns to the Department's policy of awarding benefits only for current disabilities.

But even if Johns truly believed that the Department had paid him only for future disabilities, he still should have reported them to the FAA as medical disability benefits. Question 18(y) on Form 8500-8 asked whether he had ever collected medical disability benefits, not whether he was presently disabled. Regardless of what Johns thought about his present disabilities, he had no excuse not to disclose that he was presently collecting medical disability benefits.

Johns says that he would have answered "yes" to the question if it asked about Department benefits specifically. ECF 34-1 at 119. But the question asked about all disability benefits, which includes ones from the Department. Johns testified that he did not consider himself disabled because he exercises regularly and does not "park in handicapped spots." *Id.* at 157, 119. But again, the question asks about receipt of benefits, not his subjective belief about his own disabilities. While Johns is correct that receiving Department disability benefits is "not at all incompatible with holding an FAA Medical

10

Certificate," ECF 56 at 5, the issue here is whether he lied to the FAA. The evidence shows he did.

**4.** Johns has a history of evasiveness about his sleep apnea. This detracts from his overall credibility. Johns contends that he did not have sleep apnea and that he does not know why he received a Department rating for it. ECF 11-1 at 211, 87. He denied symptoms of daytime sleepiness, *id.* at 120, and denied using a CPAP machine before 2019. ECF 34-1 at 155. But he told a medical examiner in 2013 that he had a history of "heavy snoring, fatigue, daytime lethargy, and nighttime apnea" and that he was "diagnosed with Boaderline [sic] sleep apnea" in 2005. ECF 11-5 at 14. He disliked that a flight surgeon questioned his own assessment that he did not have this medical condition, but at the same time asserted to the Department that he *did* have this medical condition. ECF 11-1 at 60–64; ECF 11-5 at 14. And while he contends that he did not start using a CPAP machine until right after the FAA began investigating him, he began receiving more than $20,000 a year in benefits beginning in 2013 that were tied mostly to a physician's determination that he needed to use a CPAP machine. All this was explained to Johns in a letter. ECF 11-4 at 30, 32 ("We have assigned a 50 percent evaluation for your obstructive sleep apnea based on: Requires use of breathing assistance device such as [CPAP] machine.").

Against all this, Johns highlights the FAA's forgiving treatment of other servicemembers who failed to respond to Question 18(y) correctly. He asserts that the FAA issued broad amnesty to thousands of servicemembers who, like him, failed to disclose disability benefits. ECF 56 at 5–6. He argues that the large number of errors suggests that he did not know that his response was false. *Id.* The Court agrees that this kind of evidence can be relevant and favors Johns. But this assertion does not outweigh the evidence on the other side of the ledger. Johns had every reason to know that his benefits were disability benefits.

11

The record refutes Johns's contention that he did not know he was receiving disability benefits. Johns sought benefits for self-reported disabilities. He discussed those medical conditions with doctors. And the Department prominently and repeatedly explained that he would receive payments for these existing disabilities but not for conditions that were not currently affecting him. The record best reflects that Johns was happy to receive over $20,000 a year in Department disability benefits but worried that disclosing these benefits would trigger FAA scrutiny about whether he was medically fit to fly.

**III.**

Johns also asserts that his false statements—even if intentional—were not material because the FAA issued him a medical certificate after he disclosed his "actual medical facts." ECF 56 at 7 (reply brief) (He "was a heavy snorer, had been evaluated, and was determined fit to fly."). Johns did not preserve this argument. What's more, it fails on its merits because the false statements were material.

Johns failed to raise this argument before the administrative law judge. During that hearing, he stipulated that the statements were material and false; he contested only whether he knew the statements were false. True, he said he was making that stipulation only for the purpose of the hearing in front of the administrative law judge. But unless a tribunal is incapable of addressing an issue, a party cannot refuse to contest an issue at a hearing and then assert the issue for the first time on appeal. *Mendez-Gomez v. Barr*, 928 F.3d 728, 732 (8th Cir. 2019) ("[F]ailure to raise an issue before the administrative agency precludes a petitioner from raising it on appeal."); *Obsorne v. United States*, 351 F.2d 111, 120 (8th Cir. 1965) ("It is fundamental that issues not raised [below] cannot be raised upon appeal."). Just so here. The Court in this case is sitting as an appellate tribunal reviewing the decision of the administrative agency. *Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 768 (8th Cir. 2011) ("A district court reviewing an administrative agency decision on the

12

administrative record is functionally analogous to an appellate court."). Johns's argument about materiality is waived.

But even if he could press his argument, the Court rejects the suggestion that his false statements were not material. "A false statement is material if it tends to impede the inquiry of an agency." *United States v. Samuels*, 874 F.3d 1032, 1037 (8th Cir. 2017) (citation omitted). The FAA mandates disclosure of disability benefits to enable it to investigate whether any underlying medical conditions could compromise flight safety. When Johns failed to report that he was receiving benefits, he necessarily impeded the FAA's investigation process. That the FAA might have cleared Johns to fly after learning about his disabilities in no way mitigates the agency's need for truthful answers.

Here, the FAA could have investigated the multiple discrepancies in Johns's record. Johns asserted that he did not have daytime sleepiness but told the Department medical examiner that he did. He denied using a CPAP machine before 2019, but his doctor said he needed one back in 2013. And Johns reported several other medical conditions to the Department when trying to claim disability benefits that he did not report to the FAA when applying for his medical certificate: eczema/rosacea, lumbar strain, tinnitus, and osteoarthritis. ECF 11-1 at 19. The false statements on his forms impeded the FAA's ability to investigate these discrepancies to determine whether Johns was fit to fly.

13

## Conclusion

Johns is not entitled to a jury trial, and he loses on the merits.  The Court **DENIES** Johns's motion for declaratory judgment, ECF 46.  The Court enters judgment in favor of the FAA.

Dated this 29th day of May, 2026

_____

JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI

14